UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br><br>v.<br><br>FRANCISCA SEPULVEDA DURON,<br><br>                              Defendant. | Case No.: 16cr1817 JM<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS STATEMENT** |

      Before the court is Defendant Francisca Sepulveda Duron's motion to suppress the statement she gave after her July 13, 2016, arrest for importation of methamphetamine. (Doc. No. 30.) The Government opposes the motion. Based on the parties' papers and oral arguments, and the court's careful review of the videotape and transcript of Defendant's interrogation, the court grants Defendant's motion.

## DISCUSSION

      Defendant advances two arguments in support of her motion. First, she argues that her statement was involuntary under the totality of the circumstances. She claims that Homeland Security Investigations Special Agents Bryan Alexander and Andrew Jones and Task Force Officer Yadira Bobadilla ("the interrogators") psychologically coerced her confession by mentioning her children, warning her of the maximum penalties for her alleged offense, emphasizing the importance of her cooperation, and suggesting that she

may be able to keep her lawful permanent resident status. Second, she argues that her statement was unwarned because the interrogators gave her conflicting Miranda advisements.

### A. Voluntariness

The court first addresses Defendant's contention that her statement was coerced and therefore involuntary.

#### 1. Legal Standards

A defendant's statement must be voluntary to be admissible, Oregon v. Elstad, 470 U.S. 298, 304–05 (1985), and the government must prove that the defendant's statement was voluntary by a preponderance of the evidence, United States v. Harrison, 34 F.3d 886, 890 (9th Cir. 1994). Coercive police activity is a necessary predicate to finding that a defendant's confession was involuntary. Colorado v. Connelly, 479 U.S. 157, 167 (1986). To determine whether a confession was involuntary, the court should consider the totality of the circumstances and assess whether "the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." Harrison, 34 F.3d at 890; see also United States v. Moreno, 891 F.2d 247, 250 (9th Cir. 1989) ("The 'crucial element' is 'police overreaching.'" (quoting Connelly, 479 U.S. at 164)). In considering the totality of the circumstances, the court should evaluate both the characteristics of the accused and the details of the interrogation. Doody v. Ryan, 649 F.3d 986, 1015–16 (2011). Ultimately, the determination "depends upon the weighing of the circumstances of pressure against the power of resistance of the person confessing." Id. at 1016 (internal citations omitted).

Because the thrust of Defendant's motion is that she was coerced into making her statements by threats of being separated from her children, a review of Supreme Court and Ninth Circuit cases on that subject is appropriate.

In Lynumn v. Illinois, 372 U.S. 528, 534 (1963), the Supreme Court condemned threats to a mother that she would be cut off from her children and lose aid if she did not cooperate. Later that term, the Supreme Court held in Haynes v. State of Washington,

373 U.S. 503, 513–14 (1963), that a written confession was the product of coercion when the suspect was threatened with losing access to his family.

A Ninth Circuit case is most instructive. In United States v. Tingle, 658 F.2d 1332 (9th Cir. 1981), the Ninth Circuit laid down a broad prohibition on eliciting a confession by reference to a defendant's children. In that case, the interviewing agent:

> recited a virtual litany of the maximum penalties for the crimes of which Tingle was suspected, totaling 40 years imprisonment. He expressly stated, in a manner that could only be interpreted in light of the lengthy sentences he had described, that Tingle would not see her two-year-old child 'for a while.' Referring specifically to her child, [the agent] warned her that she had 'a lot at stake.' [The agent] also told Tingle that it would be in her best interest to cooperate and that her cooperation would be communicated to the prosecutor. He also told her that if she failed to cooperate he would inform the prosecutor that she was 'stubborn or hard-headed.'

Id. at 1336. The court stated that it was "clear that the purpose and objective of the interrogation was to cause Tingle to fear that, if she failed to cooperate, she would not see her young child for a long time." Id. The court thought it "equally clear that such would be the conclusion which Tingle could reasonably be expected to draw from the agent's use of this technique." Id.

In concluding that the agent's statements "were patently coercive," the court stated that "[t]he relationship between parent and child embodies a primordial and fundamental value of our society. When law enforcement officers deliberately prey upon the maternal instinct and inculcate fear in a mother that she will not see her child in order to elicit 'cooperation,' they exert the 'improper influence' proscribed by Malloy [v. Hogan, 378 U.S. 1, 7 (1964)]." Id. "The warnings that a lengthy prison term could be imposed, that Tingle had a lot at stake, that her cooperation would be communicated to the prosecutor, that her failure to cooperate would be similarly communicated, and that she might not see her two-year-old child for a while must be read together, as they were intended to be, and as they would reasonably be understood." Id.

## 2. Analysis

Defendant told the interrogators that she has eight (now nine) children as they elicited background information from her. This clearly made an impression on the interrogators—after learning this, they returned to the topic of Defendant's children a number of times over the next hour or so before Defendant began to cooperate. Defendant, citing <u>Tingle</u>, argues that the interrogators' focus on her children was improper.

The interrogators bring up Defendant's children five times. Two mentions appear to be sympathetic in tone and conveyed with an apparent understanding that Defendant's motivation for the offense was financial distress given her family circumstances. There is no suggestion that the tactic condemned by <u>Tingle</u>—preying upon the maternal instincts of the suspect—was employed in these initial references. (<u>See</u> Doc. No. 36 at 40, 52.)

The next three references to Defendant's children are more troubling, and one is clearly egregious.

In the first, approximately thirty-three minutes into the interrogation, Officer Bobadilla says, "I know you have, you have kids at home, right? You want to go and be with the kids, right?" When Defendant says yes, Officer Bobadilla urges Defendant, "then do what's right, and be honest." (<u>Id.</u> at 39.) In the next, approximately forty-five minutes into the interrogation, Officer Bobadilla says, "So, like I'm telling (sic) you're a woman, you have your kids, you're just making it worse for your, for yourself. Because like I said, if you're here, it's for a reason." (<u>Id.</u> at 55.)

It is Agent Jones's exchange with Defendant during the period between Officer Bobadilla's statements that crosses into forbidden territory. After asking Defendant whether she was "going to sit here and expect me to be dumb and listen to your bullshit?" Agent Jones continues, "Do you understand that the next time you see your kids is going to be not next week, not next month?" (<u>Id.</u> at 47.) One only has to watch and listen to Agent Jones as he becomes profane, frustrated, and angry—while threatening Defendant with the prospect of not seeing her children—to understand his message.

By raising the issue again and again while at the same time representing to Defendant that she was facing ten to fifteen years in federal prison, (Doc. No. 36 at 59), and repeatedly telling her that "the judge is going to see" she is lying," (id. at 53–55), the interrogators did not adhere to the standards laid out in Tingle. Although Tingle does not establish a bright line rule prohibiting references to children, it nevertheless serves as a clarion call to interrogating agents to tread carefully when broaching the topic. Here, the interrogators did not. Rather, after learning that Defendant had a number of children, they seized on that fact and made it a central issue in the interrogation.

The challenging question then becomes assessing the cumulative effect, if any, of the references to Defendant's children—especially Agent Jones's objectively coercive reference—on Defendant's decision to admit her culpability. See United States v. Turner, 926 F.2d 883, 888 (9th Cir. 1991) ("Coercive conduct by police must have caused him to make the statements."); Brown v. Horell, 644 F.3d 969, 979 (9th Cir. 2011) ("A 'necessary predicate' to finding a confession involuntary is that it was produced through 'coercive police activity.'" (quoting Connelly, 479 U.S. at 167) (emphasis added)). Though no case appears to discuss whether the coercive conduct must be the only cause, primary cause, or simply a contributing cause of the statement, all of the case law in this area recognizes the need to carefully analyze the totality of the circumstances in determining whether a statement was the product of coercion. See, e.g., Harrison, 34 F.3d at 890; Doody, 649 F.3d at 1015–16.

Defendant's reaction to the problematic references to her children was not to cry or become emotionally undone as in Tingle. Rather, Defendant scolded Agent Jones for being disrespectful and took umbrage at his tone, repeatedly insisting that she be addressed in a respectful manner. Defendant's primary concerns actually appear to be whether she would lose her green card, whether the government had previously monitored her for possible drug-trafficking activity, why she had been repeatedly referred to secondary inspection, and whether her statements to the interrogators would be conveyed to others under suspicion. These other concerns of Defendant, as well as the

passage of time between the interrogators' most inappropriate remarks and Defendant's decision to cooperate (a period from fifteen to thirty minutes) and the lack of an outwardly emotional response to the most egregious of the interrogators' statements make it difficult to determine what role the interrogators' improper references played in her decision to cooperate. Moreover, apart from taking offense at Agent Jones's threat, Defendant was mostly calm, conversational, and inquisitive during the approximately one-and-a-half-hour interview, although there were times during the interview when Defendant expressed fear and remorse as well as anxiety over the separation from her family. (See Doc. No. 36 at 68.)

Ultimately, the court finds that any uncertainty as to the effect of the interrogators' misconduct must be resolved in Defendant's favor on this evidentiary record. The Government bears the burden to prove, by a preponderance of the evidence, that Defendant's statement was voluntary. Harrison, 34 F.3d at 890. With references to Defendant's children tactically interspersed throughout the interview, and given the Ninth Circuit's admonition that "[t]he relationship between parent and child embodies a primordial and fundamental value of our society" and is not to be used as leverage in an interview, Tingle, 658 F.2d at 1336, the court cannot say that the interrogators obtained Defendant's statement without resorting to "psychological coercion or . . . improper inducement so that the suspect's will was overborne," Harrison, 34 F.3d at 890.

Consequently, Tingle's guidance prevails: "When law enforcement officers deliberately prey upon the maternal instinct and inculcate fear in a mother that she will not see her child in order to elicit cooperation, they exert . . . improper influence . . . ." 658 F.2d at 1336. This is especially so when a suspect is told, in effect, "the judge [will] see that you're lying to us" and a long custodial sentence is suggested as a possible outcome. Accordingly, the court grants Defendant's motion on this basis.[1]

---

[1] In addition, Defendant argues that the agents coerced her confession by stating that her cooperation would be communicated to the prosecutor and that she would "not

### B. Conflicting Miranda warnings

Defendant also argues that the court should suppress her statement because the interrogators gave her conflicting Miranda warnings. This argument is premised on the interrogators' assurance to Defendant that "whatever you say in here today doesn't leave this room. The only ones that will know about it is us three and the attorneys." (Doc. No. 36 at 63.) Defendant argues that this and other similar statements served to undermine and invalidate the previously provided (and proper) Miranda warnings. In support, she cites United States v. San Juan-Cruz, 314 F.3d 384, 389 (9th Cir. 2002), in which the Ninth Circuit stated that "[w]hen a warning, not consistent with Miranda, is given prior to, after, or simultaneously with a Miranda warning, the risk of confusion is substantial, such that the onus is on the Government to clarify to the arrested party the nature of his or her rights under the Fifth Amendment."

The court doubts, as an initial matter, whether there was actually any confusion regarding whether Defendant's statement could be used against her. The tenor, body language, and general nature of the exchange reveal that the interrogators simply sought to assure Defendant that whatever she told them would not make its way to other individuals involved in the offense. (See Doc. No. 36 at 70 (telling Defendant, "if you're

---

necessarily" lose her legal permanent resident status "depend[ing] on how much [she] help[ed]" in the investigation. These representations were not improper. First, "[a]n interrogating agent's promise to inform the government prosecutor about a suspect's cooperation does not render a subsequent statement involuntary, even when it is accompanied by a promise to recommend leniency or by speculation that cooperation will have a positive effect." United States v. Leon Guerrero, 847 F.2d 1363, 1366 (9th Cir. 1988). Second, Defendant provided no authority to suggest that the interrogators were expected to provide her with certainty—or even know—the future immigration consequences of various criminal offenses. The agents told Defendant they did not know what would happen to her immigration status, and they made no promises. Nothing more was required. Cf. United States v. Buenaventura-Velasquez, 628 F. App'x 557, 558 (9th Cir.), cert. denied, 137 S. Ct. 138 (2016) (affirming district court's determination that confession not involuntary where agents did not promise defendant any help with his immigration status).

afraid that they'll do something to you because of what you tell us, like I said, we don't divulge that information that you provide to us").) Even if there was any confusion, the interrogators properly clarified the nature of Defendant's rights. For example, in response to her question, the interrogators made clear that "the judge will see everything. The judge sees all. He'll see anything, any report we do." (Id. at 63–64.) Later in the interview, the interrogators told Defendant that "whatever information you give us, and whatever we, we get, we'll present it to the AUSAs." (Id. at 75.) In short, Defendant did not receive conflicting <u>Miranda</u> warnings, and the court declines to suppress her statement on that basis.

**CONCLUSION**

For the foregoing reasons, the court grants Defendant's motion to suppress her July 13, 2016, post-arrest statement on the basis that it was involuntary.

IT IS SO ORDERED.

DATED: April 14, 2017

_____
JEFFREY T. MILLER
United States District Judge